```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ALABAMA
                  SOUTHERN DIVISION

HATTIE MCGLOWN, as guardian   }
of DANIEL MCGLOWN,            }
                              }
     Plaintiff,               }   CIVIL ACTION NO.
                              }   10-AR-2326-S
v.                            }
                              }
CITY OF BIRMINGHAM, et al.,   }
                              }
     Defendants.              }
```

**MEMORANDUM OPINION**

When *Hoyt v. Cooks*, 672 F.3d 972 (11th Cir. 2012), was decided and became the law of the Eleventh Circuit on February 27, 2012, the already "iffy" chances of this plaintiff shrank to a virtual zero. Less than a month after *Hoyt*, its controlling principles were reinforced in *Doe v. Braddy*, 673 F.3d 1313 (11th Cir. 2012). Without the guidance of *Hoyt*, this court would have a real problem deciding the motion for summary judgment filed in the above-styled case by defendants, City of Birmingham ("City"), A.C. Roper ("Roper"), and Anthony Calloway ("Calloway"). *Hoyt* is the latest and most clearly binding expression by the Eleventh Circuit on the subject hereinafter being addressed, namely, "qualified immunity" in the context of alleged excessive force in violation of the Fourth Amendment.

**INTRODUCTION**

At all times relevant, Roper was chief of police of City, a municipal corporation. At all times relevant, Calloway was a

police officer of City.  All claims arise out of an incident that occurred on August 29, 2008, in which Calloway, while performing his discretionary duties and acting in the line and scope of his employment, used mace during the arrest of Daniel McGlown ("D. McGlown"), who is a mentally disabled adult, but who, at the time, had no outward manifestation of being less than a normal black male adult.  D. McGlown's legal guardian, Hattie McGlown ("H. McGlown" or "plaintiff") is the plaintiff here.  The parties, in their pleadings, motions and briefs, have sometimes erroneously described H. McGlown as the "guardian *ad litem*" of D. McGlown, and sometimes erroneously described her as the "attorney-in-fact" for D. McGlown.  The court will overlook these mistakes.  H. McGlown is, in fact, the duly appointed guardian of D. McGlown, and as such she has standing to complain on behalf of D. McGlown in this court.

In her complaint, H. McGlown primarily invokes 42 U.S.C. § 1983, claiming: (1) that Calloway, acting as an individual under color of state law, wrongfully arrested D. McGlown after using excessive force upon him during his arrest; (2) that Roper failed properly to train Calloway on how to perform his duties under circumstances like those hereinafter described, and that Roper's failure to do so constituted a § 1983 violation by Roper; and (3) that City had a policy or practice of arresting and/or abusing mentally disabled people without probable cause and without first investigating their mental status.  Plaintiff has also invoked 42

U.S.C. § 1985, charging a conspiracy, and has pursued other theories of liability. These alternatives either have been abandoned or are without colorable merit and will not be discussed.

## STANDARD UNDER RULE 56, F.R.Civ.P.

In considering a motion for summary judgment, the court must give the non-movant, here H. McGlown, the benefit of the doubt on any dispute of material fact, including all inferences that can be drawn from the evidence in non-movant's favor. In other words, a party is entitled to summary judgment only if the facts in movant's favor are undisputed and dispositive. The court must consider all of the evidence, which, in this case, does not include the affidavit of Casey Clark, previously stricken by the court on defendants' motion.

## CITY OF BIRMINGHAM

City, as a municipal corporation, cannot be sued under § 1983 except for constitutional torts arising out of a City custom or practice that allows or ratifies the conduct being complained of. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978). Plaintiff has offered no evidence, even by the most hopeful inference, that would support a theory of liability against City under *Monell*. The mere facts: (1) that D. McGlown was maced while being arrested for allegedly disturbing the peace; (2) that he was incarcerated; and (3) that his case was later *nolle prossed*, are not enough, in and of themselves, to

support a jury's finding of the existence of an unconstitutional custom or practice by City.  It is undoubtedly true that City had a custom or practice of dispatching its police officers to respond to various emergencies, such as a claim of a theft in progress, as in this case, but such a custom or practice crosses no bright line, or even a fuzzy line, to reach the level of a constitutional tort. There was no proof that City had ever before this incident been called upon to establish protocol telling police officers how to respond to a unique situation like this one.

## POLICE CHIEF ROPER

H. McGlown concedes that Roper, the ultimate supervisor of Calloway, cannot be liable under a theory of *respondeat superior* for Calloway's conduct, unless that conduct was both unconstitutional and was expressly directed or participated in by Roper.  There is no proof, except by the fact that Roper was chief at the time of this arrest, of the degree of responsibility Roper had in training Calloway, much less that City's training program was so grossly deficient as to be laid at Roper's feet.  Exactly what a better training program could have done to help Calloway under the circumstances he faced on August 29, 2008, is anybody's guess.  Roper was not personally involved in the incident.  He found out about it when he was sued.

## ANTHONY CALLOWAY, ARRESTING OFFICER

If plaintiff has a legitimate § 1983 target, it is Calloway,

4

the arresting officer. Calloway has interposed as a defense the doctrine of "qualified immunity", a defense that is not available to City, and not needed by Roper.

## SIMILARITIES BETWEEN *HOYT* AND *MCGLOWN*

No two sets of circumstances are identical, but where the similarities greatly outweigh the differences between a case under consideration and an earlier binding case, distinctions between the two become less important. Precedent controls. *Hoyt* and *McGlown* are two peas-in-a-pod. It would take a crowbar to separate them in their essential facts. In fact, the distinctions tilt in Calloway's favor. In other words, H. McGlown has not produced a distinction that makes a difference. A fair comparison of the pertinent facts in *Hoyt* and in *McGlown* makes *Hoyt* dispositive of *McGlown*. In *Hoyt*, the Eleventh Circuit found that the arresting officers enjoyed qualified immunity, despite the holding of the trial court that the officers were **not** immune. In the instant case, Calloway, like the defendants in *Hoyt*, seeks protection under qualified immunity.

The following rendition of the relevant evidence in *Hoyt* and *McGlown* may not be in the order of their relative importance, but the similarities place *McGlown* so close to *Hoyt*, that *Hoyt* is controlling.

**Comparable Fact Number One**

In *Hoyt*, the only eye witnesses to the arrest and to the

applications of force were the two defendant police officers themselves. The victim died and was therefore not available as a witness whose recollection would be important under a Rule 56 examination.

In *McGlown*, the only eye witness is Calloway, the defendant police officer. The victim, although living, has not testified, even by affidavit, apparently because he is not competent to do so.

**Comparable Fact Number Two**

In *Hoyt*, the first police officer on the scene had been called by a radio dispatcher, who sent him to investigate a man who was acting delusional and who had called 911. The victim was never charged with a crime, although he might have been guilty of disturbing the peace, that is, if he had known what he was saying and doing.

In *McGlown*, Calloway was informed by his dispatcher that a complaint had just been received from the Auto Zone at 6661 First Avenue North, Birmingham, Alabama, that a theft was in progress. The Auto Zone manager had reported that a black male wearing a bright purple shirt, dark baggy pants, and a hat had walked out of his store with a sander/polisher in his pants. On his way to the site, Calloway noticed a black male outside of a Conoco station at 6820 First Avenue North, Birmingham, Alabama. Calloway thought the man roughly fit the description he had been given by the dispatcher. Calloway went on to the Auto Zone store not knowing

exactly what to expect.  The manager confirmed the description of the thief.

### Comparable Fact Number Three

In *Hoyt*, the officers were uniformed.  They clearly were identifiable as police officers.

In *McGlown*, the investigating officer was in uniform and was clearly identified as a police officer.

### Comparable Fact Number Four

In *Hoyt*, the first responding officer knew the victim by sight, having dealt with him before.  The officer therefore had no problem identifying the person being investigated.  From experience, the officer could anticipate bizarre behavior like that he observed when he arrived.  He called for backup because of a logically perceived need to subdue the victim, who was obviously disturbed.  The victim was alternatively aggressive and compliant.

In *McGlown*, there was no backup officer to assist Calloway.  The victim was not known by Calloway, except by the called-in description that did not perfectly fit the victim, but that a reasonably trained police officer on an emergency call might reasonably conclude described D. McGlown, the man he had previously seen two blocks away.  A crime of theft had been committed nearby, and the officer was on the lookout for a person with the Auto Zone manager's description.  In *McGlown*, as in *Hoyt*, the victim was mentally incapacitated.  Both situations presented a dilemma for

any police officer.

### Comparable Fact Number Five

In *Hoyt*, the police officers had probable cause to subdue and to handcuff the victim.

In *McGlown*, Calloway had probable cause to question D. McGlown, who blurted out "**you've got the wrong man**" even before any questions were asked. To an investigating officer, this response could reasonably be construed as an indication either that the victim was lying, or that he knew the thief, or both, thus calling for interrogation. Several other people were observing the episode at Conoco. There is nothing to indicate they knew or did not know D. McGlown. In *Hoyt*, there were no bystanders, persons who might need police protection at an arrest scene. Thus, as distinguished from *McGlown, Hoyt* presented no need to maintain crowd control or to assess risk to persons other than the officers themselves, and to the victim. D. McGlown jerked or pulled away from Calloway during the incident. There is nothing to suggest that Calloway was engaging in sadistic pleasure, or that he realized that D. McGlown was less than capable of answering pertinent questions. The "pulling away" by D. McGlown suggested the possibility of flight, and an objectively reasonable officer might well interpret it as such. D. McGlown obviously recognized Calloway as a police officer. His behavior, plus the crowd, could easily have suggested a need to maintain control over D. McGlown in a volatile situation.

**Comparable Fact Number Six**

In *Hoyt*, the officers used their tasers as many as eighteen times (using the number of deployments or downloads indicated by the police records and referred to by the Eleventh Circuit). The officers themselves readily admitted that they used their tasers more than once, just as Calloway admits he used mace one time. In *Hoyt*, the officers disagreed with each other on who used tasers, in what order, how many times, and in what mode. There is nothing in the police headquarters' records in *Hoyt* to reflect the activation download indicating **exactly** how many times the tasers were employed in the **probe** mode, and how many in the **dry stun** mode, but the Eleventh Circuit found that because there was no witness to contradict the officers, the probe mode was only used once as they testified. In other words, the officers' statements on this crucial point were taken as true. A taser in the probe mode is powerful, hurtful, and serious, and is not often used during an arrest. The degree of force applied in *Hoyt* was found by the Eleventh Circuit to be reasonable under the circumstances, although whatever the level of force, it caused or contributed to the death of the victim. There was no evidence in *Hoyt* of an autopsy of the victim that, if it had been undertaken, might have shown the actual number of probes used. Neither a taser probe, nor a taser stun, nor a discharge of mace, nor a discharge of pepper spray, is pleasant for its target, but the taser is the most unpleasant and

dangerous of these control devices.

In *McGlown*, the much less dangerous police weapon, mace, was employed. Only one application was made during the arrest. Although the mace resulted in pain, and in a relatively short incarceration without medical attention except for treatment for D. McGlown's reaction to the mace, it did not result in permanent injury. There is nothing unusual or unreasonable about an officer's undertaking to question a person while the officer is investigating a very recently committed nearby criminal act. D. McGlown "resisted", although he obviously did so in a way that did not call for a taser if Calloway had a taser.

**Comparable Fact Number Seven**

In *Hoyt*, there were some discrepancies in the testimonies of the arresting officers, but none of them were found by the Eleventh Circuit to be severe enough to call for questioning the credibility of the officers. As stated, there were no independent or third-party witnesses to rebut the officers' somewhat inconsistent versions of the facts. The Eleventh Circuit was able to reconcile any such differences in favor of the defendants.

In *McGlown*, Calloway's early statement to his police department investigator does not jive in all respects with his much later responses to deposition questions, but the differences are immaterial, or are certainly less material than those in *Hoyt*. This court has no problem finding Calloway to be more credible in

his recollection of the pertinent facts than no witness at all.

**Comparable Fact Number Eight**

In *Hoyt*, the victim was handcuffed during his arrest. This is customary police practice, and does not constitute excessive force unless the cuffs are deliberately made so tight as to cause injury. The officers in *Hoyt* searched the victim's home without a warrant in order to secure the premises before they departed with the handcuffed and groggy or unconscious victim. How long this search took before the victim was taken to the station is not reflected in the record. The victim was administered CPR when no pulse was detected, but the victim died.

In M*cGlown*, the victim, as in *Hoyt*, was handcuffed during the arrest. However, there is no evidence that a search of his person was conducted. The use of handcuffs during an arrest is customary police practice and does not constitute excessive force unless the cuffs are made so tight as to cause injury.

**THE ISSUE**

There are many more similarities between *Hoyt* and *McGlown* than there are dissimilarities. Both fact situations called for an exercise of police judgment under stressful circumstances. Plaintiff, H. McGlown, and her very competent counsel, have valiantly attempted to distinguish *Hoyt* from *McGlown*. They have primarily employed pre-*Hoyt* cases, some of them bearing a resemblance to *McGlown*, and some not. The court in *Hoyt* did not

need to hold, and did not hold, that the officers there used perfect judgment. In the heat of battle, and not by hindsight, a police officer can act "reasonably", while still being accused of exercising "poor judgment". A § 1983 violation and "poor judgment" are not the same thing. Not every police officer would have reacted in precisely the same way Calloway did, but well-trained police officers are human beings, and they have an important, dangerous and difficult job to do. This court is not prepared to say that Calloway used either good judgment or bad judgment, because that is not the question before the court any more than it was in *Hoyt*.

## ANALYSIS

This court has endeavored, just as H. McGlown has endeavored, to find a meaningful distinction that would take her case out of the *Hoyt* handcuffs, but this court has been unable to find such a distinction.

*Hoyt* is the most recent § 1983 case by the Eleventh Circuit dealing with an alleged use of excessive force. It is the latest in a long line of cases that continue to illustrate the expansive embrace of "qualified immunity". The *Hoyt* court could well be describing the instant case when it said: "**In this case, there is no precedent that staked out a bright line**." 672 F.3d 972, 978. (emphasis added). Also, the "balancing of interests" was recognized by the Eleventh Circuit in *Hoyt* as a serious factor to

be considered. In the balancing act before this court, this court topples in favor of Calloway. *Hoyt* may not have created a bright line for Calloway or for this court, but it teaches a meaningful lesson. It is a rare case today in which a § 1983 plaintiff, although he is given the benefit of the doubt under Rule 56, can overcome the somewhat incongruous and competing, but ever present, "benefit of the doubt" due law enforcement officers under a "qualified immunity" analysis of their actions.

If further proof of the dispositive effect of *Hoyt* on *McGlown* were needed, both this court and the Eleventh Circuit are bound by the June 4, 2012 opinion of the Supreme Court of the United States in *Reichle v. Howards*, ____ U.S. ____, 132 S.Ct. 2088 (2012), which was not available to the parties when they filed their briefs in this case. *Reichle* is more distinguishable from *McGlown* on its facts than is *Hoyt*, but it reaffirms and expands the breadth and force of the defense of "qualified immunity", a doctrine expressly designed to protect law enforcement officials from suit, unless the performance of the act complained of, is, by unequivocal and well understood precedent, so obviously beyond the constitutional pale, as to stop any reasonable law enforcement officer in his or her tracks. *Reichle* requires that a "clearly established standard" be proven by the plaintiff, and that the said standard was violated before the plaintiff can reach a trial on the merits. This court cannot find any "clearly established standard" that Calloway

violated.  This court shares H. McGlown's feeling that this situation could have been handled better, but this court cannot say how exactly it should have been handled.  A police officer cannot pause to reflect upon all of the alternatives that might be effective, but that might expose him or her to § 1983 liability.  Walking on eggshells can be dangerous.

In *Florence v. Board of Chosen Freeholders*, ____ U.S. ____, 132 S.Ct. 1510 (2012), decided shortly before *Reichle*, the Supreme Court predicted *Reichle* by emphasizing the "risk" factor inherent in a decision whether to detain or not to detain a person when law enforcement officials, operating under volatile conditions, have competing pulls upon them.  All risk cannot be eliminated while persons are discharging their duties as law enforcement officials.

It is lamentable that Calloway, Roper, and/or City did not try to explain to McGlown's family why Calloway did what he did on August 29, 2008, and to apologize for any harm done.  This may be deplorable, but the court knows it is impossible in today's world to expect an apology for an act that the actor may thereafter be called upon to defend in court.  This is the world we live in.

## CONCLUSION

For the foregoing reasons, the motions of the defendants for summary judgment will be granted by separate order.

DONE this 21st day of June, 2012.

```
                              _____
                              WILLIAM M. ACKER, JR.
                              UNITED STATES DISTRICT JUDGE
```